**In re Vernon E. JOHNSON, d/b/a Johnson Dairy Supply, Debtor.**

**Bankruptcy No. 3–86–2031.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Feb. 17, 1987.

---

Bruce Wenger, Redwood Falls, Minn., for debtor.

Michael Stewart and Dennis Ryan, Minneapolis, Minn., for Belview State Bank.

Sheridan Buckley, St. Paul, Minn., trustee.

## ORDER

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter is before the Court upon objection of Belview State Bank (Bank) to certain of the Debtor's claimed exemptions. Michael Stewart and Dennis Ryan represent the Bank. Bruce Wenger represents the Debtor. The matter was heard on November 12, 1986, after which counsel were afforded additional time to file supplemental briefs, the last of which was filed on December 1, 1986. Based upon testimony and arguments presented at the hearing, as well as the entire file and records herein, including memoranda of counsel, the Court now being fully advised in the matter makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I.

This Chapter 7 case was filed under Title 11 of the United States Code on July 28, 1986. The Debtor, in his Schedule B-4 filed with the petition, claimed as exempt homestead property, 160 acres of rural homestead real estate as allowed by MINN.STAT. § 510.01 (1984) and § 510.02 (1984), as amended by 1986 Minn.Sess. Laws, Ch. 398, Art. 16, § 1. The 1986 amendment increased prior exemption entitlement for rural homesteads in Minnesota from 80 to 160 acres and was effective at the time of the filing. The Bank is an unsecured creditor with respect to the claimed exempt property, and the debt was owing before the 1986 amendment was enacted.

The Bank timely filed objection to the claimed exemption on two grounds. First, the Bank contends that to allow the Debtor the 160 acre homestead exemption under the 1986 amendment would constitute an unconstitutional impairment of the Bank's contract with the Debtor in violation of art. I, § 10, cl. 1 of the United States Constitution. Secondly, the Bank argues that to allow the 160-acre exemption would be contrary to the legislative intent that the amendment be applied prospectively only, that is to debts arising after its effective date, and not to those creditors such as the Bank whose claim predated the amendment.

### II.

The United States Constitution, in art. I, § 10, cl. 1, provides in relevant part: "No State shall ... pass any ... Law impairing the Obligation of Contracts ..." The Constitution became operative on March 4, 1789, and during its first 100 years' application, the United States Supreme Court strictly construed this provision, referred to as the "Contracts Clause".[1]

Typical of the early strict construction, was the case of *Edwards v. Kearzey*, 96 U.S. (6 Otto) 595, 24 L.Ed. 793 (1877), heavily relied upon by the Bank in this proceeding.[2] *Kearzey* involved a federal constitutional challenge to the application against preexisting creditors, of a state constitutional provision and resulting enabling legislation of North Carolina, that allowed state residents a newly created homestead exemption. The Supreme Court framed the issue, in light of the Contracts Clause, as: "... whether the exemption was valid as regards contracts made before the adoption of the Constitution of 1868".[3] *Kearzey*, 96 U.S. (6 Otto) at 599.

In striking down the state constitutional provision and enabling legislation, as ap-

---

**1.** For an interesting and well-documented description of the social, economic and political climate in which the Contracts Clause was created, see the dissenting opinion of Justice Sutherland in *Home Bldg. & L. Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

**2.** The Bank's constitutional argument is premised on the holding of *Kearzey* and on subsequent holdings of various other courts through-

out the United States that were themselves premised on that decision. *See, e.g., Dunn v. Stevens*, 62 Minn. 380, 64 N.W. 924 (1895) and *Gregory Co. v. Cale*, 115 Minn. 508, 133 N.W. 75 (1911). Both these decisions of the Minnesota Supreme Court, also relied upon by the Bank, are premised solely upon *Kearzey*.

**3.** The North Carolina Constitution became effective on April 24, 1868.

plied against preexisting creditors, the Court said:

> The obligation of a contract includes every thing within its obligatory scope. Among these elements nothing is more important than the means of enforcement. This is the breath of its vital existence. Without it, the contract, as such, in the view of law, ceases to be, and falls into the class of those "imperfect obligations," as they are termed, which depend for their fulfilment upon the will and conscience of those upon whom they rest. The ideas of right and remedy are inseparable. *Kearzey*, 96 U.S. (6 Otto) at 600.

And, in concluding the opinion, the Court held that:

> The remedy subsisting in a State when and where a contract is made and is to be performed is a part of its obligation, and any subsequent law of the State which so affects that remedy as substantially to impair and lessen the value of the contract is forbidden by the Constitution, and is, therefore, void. *Kearzey*, 96 U.S. (6 Otto) at 607.

The holding applied to all preexisting creditors without regard to secured, unsecured, prejudgment or post-judgment status.

If *Kearzey* and its progeny control determination of the issue here, nothing more need be said. But they do not. During its second 100 years, strict construction of the Contracts Clause has been abandoned by the Supreme Court. The landmark case of *Home Bldg. & L. Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), evidenced that abandonment and served as a watershed that diverted the course of later Contracts Clause analysis to a channel that some say has effectively washed the clause out of the Constitution.[4] In *Blaisdell*, the Court sustained a Minnesota mortgage foreclosure moratorium statute, even though it retroactively impaired contract rights. The statute was intended to be remedial during the depression of the 1930s, was emergency legislation, and was temporary. The Court balanced the Contracts Clause against the state's interests in exercising its police power, and concluded that the statute was justified. Significant in the analysis were these factors:

1. the statute was an emergency measure;

2. it was intended to protect a basic social interest;

3. it was appropriately tailored to its purpose;

4. it imposed reasonable conditions; and,

5. it was limited to duration of the emergency.

Since *Blaisdell*, earlier Supreme Court decisions involving the Contracts Clause have ultimately had little influence in the

---

4. In *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), Justice Stewart, writing for the majority, observed:

> Although it was perhaps the strongest single constitutional check on state legislation during our early years as a Nation,[11] the Contract Clause receded into comparative desuetude with the adoption of the Fourteenth Amendment, and particularly with the development of the large body of jurisprudence under the Due Process Clause of that Amendment in modern constitutional history.[12] Nonetheless, the Contract Clause remains part of the Constitution. It is not a dead letter. And its basic contours are brought into focus by several of the Court's 20th century decisions. *Id.* at 241, 98 S.Ct. at 2720.

His explanation in Footnote 12 was:

> 12. Indeed, at least one commentator has suggested that 'the results might be the same if the contract clause were dropped out of the Constitution, and the challenged statutes all judged as reasonable or unreasonable deprivations of property.' Hale, The Supreme Court and Contract Clause: III, 57 Harv.L. Rev. 852, 890–891 (1944). *Id.* at 241, 98 S.Ct. at 2720.

The *Allied* Court invalidated a Minnesota Statute based on the Contracts Clause, but from the facts of the case and the Court's reasoning, it is apparent that the statute could not have withstood a 14th Amendment Due Process Clause challenge. Furthermore, in a more recent Supreme Court case involving the Contracts Clause, *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Court articulated present standards for analysis, drawing heavily from *Allied*. The standards enunciated do not significantly differ from Due Process standards.

development of modern constitutional interpretation of it. In 1934, the Supreme Court struck down an Arkansas Statute, based on the Contracts Clause, citing *Edwards v. Kearzey. See W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 54 S.Ct. 816, 78 L.Ed. 1344 (1934).

In *Thomas*, the plaintiff had a lien on certain life insurance proceeds due the defendant. Before the lien could be foreclosed, Arkansas enacted a law exempting from judicial process the proceeds of life insurance policies payable to residents of the state. The Court, in distinguishing the Arkansas statute from *Blaisdell*, reasoned that the relief provided by the Arkansas statute was neither temporary nor conditional; and no emergency was shown.[5]

But the holding in *Thomas* proved to be a short spell from the rushing tide generated by *Blaisdell*. The Supreme Court has since held that the public purpose of a statute need not be addressed to an emergency or temporary situation in order to withstand a constitutional Contracts Clause challenge. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Veix v. Sixth Ward Bldg. & Loan Assn.*, 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940).[6]

Present Supreme Court standards applicable to Contracts Clause analysis are set out in *Energy Reserves*. There exist three areas of inquiry and consideration. They are:

1. "The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.' ... Total destruction of contractual expectations is not necessary for a finding of substantial impairment. ... On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment.... In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past." 459 U.S. at 411, 103 S.Ct. at 704.

2. "If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation.... such as the remedying of a broad and general social or economic problem.... Furthermore, since *Blaisdell*, the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation.... The requirement of a legitimate public purpose guarantees that the State

5. It is interesting to note that the Arkansas statute probably would not have survived a 14th Amendment Due Process Clause challenge.

6. The Court in *United States Trust Co. v. New Jersey*, invalidated a New York Statute, applying the Contracts Clause. The majority opinion, authored by Justice Blackmun, seems to express a resigned and quiet frustration with Contracts Clause analysis in the modern application of constitutional law. In setting the stage for the analysis, he said: "Whether or not the protection of contract rights comports with current views of wise public policy, the Contract Clause remains a part of our written Constitution. We therefore must attempt to apply that constitutional provision to the instant case with due respect for its purpose and the prior decisions of this Court." *United States Trust Co.*, 431 U.S. at 16, 97 S.Ct. at 1514. Justices Brennan, White and Marshall expressed a more vocal frustration

in the dissenting opinion, authored by Justice Brennan. The dissenters charged that "The Court today dusts off the Contract Clause and thereby undermines the bipartisan policies of two States that manifestly seek to further the legitimate needs of their citizens." *United States Trust Co.*, 431 U.S. at 44–45, 97 S.Ct. at 1528–1529. It is significant that Justice Blackmun, who wrote for the majority in *United States Trust Co.*, later wrote for the majority in *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) which enunciates the present standards applicable in Contracts Clause analysis. Those standards seem to be due process standards. Thus, it appears that the tide created by *Blaisdell* has washed out of the Contracts Clause any unique application in modern constitutional law.

is exercising its police power, rather than providing a benefit to special interests." 459 U.S. at 411–12, 103 S.Ct. at 704.

3. "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption. ... Unless the State itself is a contracting party '[a]s is customary in reviewing economic and social regulation.... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' " 459 U.S. at 412–13, 103 S.Ct. at 704–05.

The first question in this case, then, is whether the Minnesota Statute increasing the homestead exemption substantially impaired the Bank's contractual relationship with the Debtor. Resolution of the question must be made in light of what the reasonable expectation of the parties was when the debt was created. The Bank insists that it relied upon the net worth of the Debtor in making the various loans constituting the debt, and that it specifically relied upon the availability of property not then subject to exemption for satisfaction of the debt, if necessary.

The reality of modern commercial transactions is that a lender who reasonably expects specific property to be available to satisfy an obligation, takes a secured position in the property. A lender's expecta-

tion of later realization of payment from unsecured property in existence at the time of contract is, absent unusual circumstances, an expectation founded on pure speculation. Realization of payment from such property is necessarily dependent upon circumstances and rights that do not exist at the time of unsecured contract and that are not created by it. It is dependent upon continued retention of ownership and equity in the property by a debtor as well as the subsequent creation of a lien by judgment and/or levy.

■■■■ A creditor's right to enforcement of the contract through remedy of judgment and levy against specific unsecured property of a debtor is an implied contract right. But the contractual relationship of parties is not substantially impaired by later legislation compromising or eliminating that right unless the right otherwise has substantial value to the contractual relationship at the time of the legislation complained of. Where an unsecured claim has not been reduced to judgment prior to such legislation, the abstract right of potential enforcement out of specific unsecured property, standing alone, ordinarily has no substantial value to the contractual relationship in light of modern commercial transactions.[7] This is particularly so where the legislation compromising or eliminating the right is in an area of established, long-standing legislative control and regulation, such as homestead exemption laws. The abstract right is simply one without reasonable expectation of fulfillment.[8]

---

7. A judgment creditor with a lien on property either by the judgment itself or by levy, ordinarily need not rely on the Contracts Clause in challenging the validity of an intervening exemption statute, since the lien creditor has a 14th Amendment Due Process claim. Whether a judgment creditor without a lien suffers substantial impairment of contract under the Contracts Clause by enactment of an exemption statute prior to levy, is not at issue here. However, it would seem that a relevant inquiry would be whether the implied contract right of enforcement had matured through the judgment to a right having substantial value at the time of its compromise or elimination by the legislation complained of.

8. Prepetition debt owing the Bank is at least $295,686.00. It is secured by inventory, equipment, crops, general intangibles and a mortgage on real estate not claimed exempt by the Debtor. The Bank is undersecured by at least $170,-000.00. The Bank is not in the business of making unsecured loans to farmer-debtors in six-figure numbers. At the time of the transaction, undoubtedly the Bank considered itself to be fully secured and it probably was. The reasonable expectation of the parties was that the secured property would be available and would be sufficient to satisfy the debt, if necessary. The present undersecured circumstances of the debt are the result of a catastrophic decline in

Applying the foregoing reasoning to the present case, the Court finds that application of Minnesota Homestead Exemption Statute § 510.02 (1984), as amended by Minn.Sess.Laws, Ch. 398, Art. 16, § 1 (1986), does not operate to substantially impair the contractual relationship of the parties to this proceeding.

■ But even if it were otherwise, application of the statute must be sustained. The amendment was enacted as part of the 1986 Omnibus Farm Bill, 1986 Minn.Sess. Laws Ch. 398, which was intended to address the severely depressed economic conditions of rural Minnesota. Clearly, the statutory purpose was to remedy a broad and general economic problem. Whether the legislative purpose addressed is an emergency, is a matter of perspective. However, under *Energy Reserves,* a finding of emergency is not necessary to sustain legislation against a Contracts Clause challenge. 459 U.S. at 412. Furthermore, although the statute is not temporary, that is not a controlling factor either. The Minnesota Statute increasing the homestead exemption from 80 to 160 acres as applied to the Bank, serves a legitimate public purpose and is a valid exercise of the State's police power under *Energy Reserves.*

Finally, even if the application of the statute substantially impaired the contractual relationship of the parties, since it is a valid exercise of the State's police power, it must be sustained if it is reasonable. Whether economic and social regulation is necessary and reasonable, is ordinarily deferred by the courts to legislative judgment. There is no basis upon which this Court can find that MINN.STAT. § 510.02, as amended in 1986, is unreasonable on its face or in its application to the Bank.

Accordingly, based upon the foregoing reasoning, the Court finds that application to the Bank of MINN.STAT. § 510.02 (1984), as amended by Minn.Sess.Laws, Ch. 398, Art. 16, § 1, does not violate U.S. Constitution, art. I, § 10, cl. 1.

### III.

The Bank argues that the 1986 Minnesota Statute increasing rural homestead exemption must be interpreted as applying only to debts arising after the its effective date. Thus, it contends that, even if the statute's application against the Bank is constitutional, the objection to exemption should be sustained since the debt owing the Bank predated the statute.

The Minnesota Legislature has declared that "no law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature". MINN.STAT. § 645.21 (1984). The language of the 1986 amendment to MINN.STAT. § 510.02 states that the amendment shall become "effective" the day following final enactment. The Bank argues that application of MINN.STAT. § 510.02, as amended in 1986, would be retroactive in violation of MINN.STAT. § 645.21.

■ A statute is not retroactive merely because it relates to preexisting persons, entities, legal relationships or facts. *In re Estate of O'Keefe,* 354 N.W.2d 531 (Minn. Ct.App.1984). Therefore, it does not necessarily follow that simply because the exemption statute here might relate to a preexisting contractual relationship, or debt arising under it, that the statute is retroactive. In the absence of contrary, specific, definitive statutory language [9], de-

---

the agriculture industry in Minnesota that is now near collapse. Neither the Bank nor the Debtor anticipated or had any control over the debacle. But it strains credibility to now say that at the time of the transaction, the right to judgment and levy on specific unsecured property was a substantial element of the contractual relationship. Furthermore, it strains logic to say that legislation eliminating a remedy that was never reasonably relied upon, constitutes a substantial impairment of the contractual rela-

tionship simply because the remedy was an implied right under the contract.

9. Consider for example, former MINN.STAT. § 510.03 which provided: "[a]s against debts contracted prior to the taking of effect of Revised Laws 1905, the homestead exemptions then established shall be neither enlarged nor diminished by the provision of this Chapter." R.L. 1905 § 3454. The clause was repealed in 1951 and no similar provision has since been enacted.

termination of whether a particular statute is retroactive should be based, not on whether it relates to preexisting legal relationships, etc., but on how it affects them.

 If the statute does not operate to impair a vested right, it is not retroactive. It is prospective, even though it relates to, and in some respects governs, a preexisting relationship. In this case, the Bank did not have any vested right, title or interest in the property, which was the subject of the legislation at the time of its enactment. A vested right is more than a mere expectation based upon an anticipated continuance of existing law. *In re Estate of O'Keefe*, 354 N.W.2d at 535.

But even if the application of the 1986 exemption statute to the preexisting unsecured debt owing the Bank is considered to be retroactive, the Court is drawn to the irresistible common-sense conclusion that the legislature intended it to be so. The 1986 Omnibus Farm Bill was intended to address an existing and deepening crisis in rural Minnesota. It was not intended to address a future, anticipated crisis. The relief provided was a remedy for present distress.

### IV.

In conclusion, the Court holds that MINN.STAT. § 510.02 (1984), as amended Minn.Sess.Laws, Ch. 398, Art. 16, § 1, which increased the rural homestead exemption from 80 to 160 acres, when applied to the preexisting unsecured debt of the Bank, which was without judgment at the time of enactment, does not violate the Contracts Clause of U.S. Constitution, art. 1, § 10, cl. 1. Further, the Court finds that the Minnesota Legislature, in enacting the 1986 statute, intended that the increased exemption apply against preexisting unsecured debt owing lenders, whether application of the statute be considered retroactive or prospective in nature. From that, the Court holds that the full exemption entitlement of 160 acres exempt homestead property claimed by the Debtor applies against the Bank in this case.

ACCORDINGLY, IT IS HEREBY ORDERED: the objection of Belview State Bank to the homestead exemption claimed by the Debtor is overruled.